UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 0:25-cr-60239-LEIBOWITZ

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.

ORLANDO DWAYNE SAMUELS,

    *Defendant.*

_____/

## ORDER DENYING MOTION TO SUPPRESS

This case exquisitely demonstrates something every criminal procedure student learns at the University of Miami School of Law: The Fourth Amendment doesn't turn on the subjective intentions of police officers, if their actions are objectively reasonable considering all the circumstances.

On February 2, 2026, Defendant Orlando Dwayne Samuels ("Defendant" or "Samuels") moved to suppress evidence obtained from the inside of a vehicle he was driving, as well as some fruit of the poisonous tree, as it were (the "Motion") [ECF No. 32]. The Motion has been fully briefed, an evidentiary hearing was held, and the matter is now ripe for consideration. After careful review, the Motion [**ECF No. 32**] is **DENIED**.

### I.    PROCEDURAL BACKGROUND

On September 10, 2025, a criminal complaint was filed against Samuels alleging that he possessed a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1). [ECF No. 1 at 7]. On October 16, 2025, the grand jury returned an indictment against him on that count. [ECF No. 22].

Samuels moves to suppress evidence seized during his September 8, 2025, traffic stop and subsequent arrest, including three firearms. [ECF No. 32 at 1]. He also seeks to suppress all

inculpatory statements made to law enforcement derived from the unlawful search of the vehicle he was driving that day. [*Id.*]. After the Government waived the issue regarding Defendant's entitlement to an evidentiary hearing on the suppression motion, one was held on March 6, 2026. [ECF No. 37]. Following the hearing, the Court ordered the parties to submit supplemental briefing on relevant issues. [ECF No. 39].

## II.    FACTUAL FINDINGS

Consistent with the record and evidence presented at the hearing,[1] the Court makes the following findings of fact:

On September 8, 2025, Deputy Sheriff Austin Chauvin ("Deputy Chauvin") for the Broward Sheriff's Office ("BSO") responded to a call concerning the stalking and harassment of the female victim earlier that day.[2] [Hr'g Tr., ECF No. 45 at 16:16–18, 17:19–18:5]. Deputy Chauvin met the victim in public at the Hampton Inn in Tamarac, Florida, because she did not feel comfortable meeting at her residence. [*Id.* at 18:6–14]. The victim told Deputy Chauvin that her ex-boyfriend, Samuels, showed up at her residence unannounced and continuously blocked her vehicle in with another vehicle, preventing her from leaving her home to file a domestic violence complaint. [*Id.* at 18:15–21, 19:1–4]. When she tried to evade and escape him, Samuels followed her through the neighborhood and continuously ambushed her, yelling obscenities at her until she finally left the area. [*Id.* at 18:21–25].

After this meeting, Deputy Chauvin then proceeded to drive through the victim's

---

[1]    At the status conference held on May 1, 2026 [ECF No. 57], the parties stipulated to the admission of the following exhibits as part of the evidentiary record: (1) a photograph of the black Nissan Versa parked in the westbound turn lane on NW 50th Avenue; (2) body camera footage of the September 8, 2025, traffic stop (filed conventionally); (3) the Broward Sheriff's Office Policy Manual; (4) a Broward Sheriff's Office Towed Vehicle & Inventory Receipt Form; and (5) an Evidence Unit Property Sheet. [*See* ECF Nos. 38, 40, 47-1, 47-2, 47-3, 47-4].

[2]    The Court keeps the name and initials of the victim out of this Order for obvious reasons.

neighborhood in Tamarac to pinpoint where exactly Samuels had been allegedly blocking her vehicle. [*Id.* at 19:23–20:8]. By this time, Deputy Chauvin conducted a records check of Samuels and discovered that he had a suspended license on the day of the incident. [*Id.* at 23:1–3]. He also learned that Samuels was driving the victim's black Nissan Versa. [*Id.* at 22:23–25].

Deputy Chauvin eventually arrived at a location around Northwest 50th Street where he suddenly observed a black Nissan Versa matching the description of the victim's vehicle driving northbound on the street adjacent to her residence. [*Id.* at 22:16–21, 23:4–7]. Deputy Chauvin radioed backup officers to assist in stopping the vehicle and arresting Samuels under suspicion of driving with a suspended license and stalking. [*Id.* at 23:7–15]. Two fellow deputies arrived to help Deputy Chauvin; a short time later, Samuels stopped the vehicle at the intersection of Northwest 50th Avenue and West Commercial Boulevard near a red light heading northbound. [*Id.* at 23:19–24:1]. The three BSO deputies then proceeded to conduct a traffic stop where Samuels had parked the Nissan Versa, in the middle of the westbound turn lane. [*Id.* at 24:2–3, 25:1–20; ECF No. 48 at 3].[3] To say it plainly: Samuels stopped and parked the car in the middle of a public street, not on the side of the road.

At approximately 10:07 a.m., the BSO deputies stopped Samuels to arrest him for driving with a suspended license and possible stalking. [Hr'g Tr., ECF No. 45 at 23:9–15, 36:7–12, 38:14–17]. Equipped with body-warn cameras, the three BSO deputies ordered Samuels out of the vehicle. [*Id.* at 27:23–28:8]. Deputy Chauvin observed Samuels making several overt moments towards the passenger seat of the car before Samuels exited the car; after Samuels exited the vehicle, the driver-side door closed and locked behind him. [*See id.* at 28:9–29:1]. The deputies immediately placed him

---

[3]     The pinpoint citation to this docket entry of the Government's briefing represents Government's Exhibit 1, depicting the location of the parked Nissan Versa captured on body camera footage, which was received into evidence at the suppression hearing. [Hr'g Tr., ECF No. 45 at 25:16–20]. This citation is used because the parties did not separately file this exhibit on the docket.

into handcuffs and secured him in a marked BSO police vehicle. [*Id.* at 28:21–23]. At that point, Deputy Chauvin approached the Nissan Versa to clear it of any hidden dangers and attempted to open the locked vehicle. [*Id.* at 38:18–39:9]. The three deputies noticed a backpack in the vehicle and tried to open the locked doors again, with Deputy Chauvin saying, "There's got to be something. He was reaching around." [*Id.* at 41:1–13].

The BSO deputies conducted an initial pat-down of Samuels but turned up no key to the Nissan Versa.[4] [*Id.* at 29:5–12]. Since the victim resided close by, Deputy Chauvin asked Deputy Daniel Barbato ("Deputy Barbato") to go see if the victim had a second key to the Nissan Versa (just before switching off his body camera). [*Id.* at 29:13–30:1, 42:3–6]. Deputy Barbato left the scene of the arrest at approximately 10:12 a.m. to see if the victim could unlock and secure her belongings from the vehicle. [*See id.* at 30:5–14, 41:25–42:6]. During his meeting with the victim at her residence, Deputy Barbato did not have his body-warn camera activated. [*See id.* at 42:13–25, 55:9–20]. Deputy Barbato did, however, confirm that he asked the victim for another set of keys to the Nissan Versa. [*Id.* at 55:21–56:4]. Deputy Chauvin also did not alert the victim that Samuels had been arrested and that she would need to get her car before it was towed. [*Id.* at 40:11–21].

Sometime before 10:43 a.m., Deputy Barbato returned to the arrest scene with no key to the Nissan Versa. [*See id.* at 30:2–31:1, 42:7–9]. By this time, Deputy Chauvin already arranged for a tow truck driver to impound the vehicle because it was still stuck in the middle of the road and presented a traffic hazard. [*See id.* at 30:15–31:1, 56:12–16]. (It is unclear exactly when the call to tow the vehicle was made and exactly when the tow truck driver arrived because Deputy Chauvin's body camera was turned off at this time. [*See id.* at 43:1–15].) The timing of the video makes clear that the truck was certainly present on the scene by 10:43 a.m., after Deputy Barbato returned with no key. [*See id.* at

---

[4]    The key was ultimately recovered from Samuels's anal cavity later in the Tamarac district holdings cells. [*Id.* at 32:15–22].

30:21–31:1, 42:7–9].

The tow truck driver unlocked the Nissan Versa using a slim-jim tool that opened the A-frame of the driver's side window, allowing the driver to unlock it from the inside. [*Id.* at 31:2–7]. Once unlocked, the deputies can be heard from the camera footage—at approximately 10:49 a.m.—discussing the justification of the search, including whether it was a search incident to arrest. [*See id.* at 45:15–25; 56:9–57:5].

The BSO proceeded with an inventory search of the vehicle prior to it being towed. [*Id.* at 31:8–18]. According to BSO policy, an inventory search occurs before the car is impounded because once the vehicle gets towed out of the roadway, the BSO is no longer in control of the car and the tow truck driver may have access to whatever is inside. [*Id.* at 31:19–32:2]. The inventory search revealed several items, including a black backpack with three firearms inside located on the passenger seat, money, shoes, knives, condoms, and cell phones. [*Id.* at 32:3–8; ECF No. 47-3 at 1; ECF No. 47-4 at 1–5]. When the firearms were discovered, Deputy Chauvin exclaimed, "Jackpot, baby. I f-ing knew it." [Hr'g Tr., ECF No. 45 at 44:20–24]. The retrieved items were subsequently documented on an inventory tow slip and property form. [*Id.* at 45:12–13; ECF Nos. 47-3, 47-4].

## III.    LEGAL STANDARD

"A motion to suppress must in every critical aspect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985) (citing *United States v. Smith*, 546 F.2d 1275 (5th Cir. 1977)).[5] "In short, the motion must allege facts which, if proven, would provide a basis for relief. A court need not act upon general or conclusory assertions founded on mere suspicion or conjecture[.]" *Id.* (citing *United States v. Harrelson*, 705 F.2d 733 (5th Cir. 1983)).

---

[5]    All decisions handed down by the Fifth Circuit prior to September 30, 1981, are binding authority for this Court. *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

"It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) (collecting cases).  But "in some well-defined situations the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant." *Id.*  So, "if a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search."  *Id.*  The evidentiary burden at a suppression hearing is by a preponderance of the evidence.  *See United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974).

## IV.   LEGAL ANALYSIS

After the Court conducted the evidentiary hearing on March 6, 2026 [ECF No. 37], the undersigned ordered the parties to brief the following issues: (1) standing; (2) the legality of the stop and arrest; (3) the inventory search exception; and (4) the inevitable discovery doctrine.  [ECF No. 39 at 1].  The Court addresses the first three issues but declines to address the fourth issue because the BSO performed a valid inventory search that comports with the Fourth Amendment.

### A.   Standing

Generally, it is the defendant's burden to establish that he or she has standing; that is, the defendant must establish a subjective expectation of privacy in the object to be searched that society would deem reasonable.  *See United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) (citing *United States v. Eyster*, 948 F.2d 1196, 1209 (11th Cir. 1991)); *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

Here, however, the Government conceded the issue of Samuels's standing to challenge the search of the black Nissan Versa he was driving when BSO conducted the traffic stop.  [ECF No. 48 at 2].  Given this concession, the Court finds that Defendant has standing.

### B.   Legality of the Stop and Arrest

The Government bears the burden in demonstrating the legality of a warrantless stop, search,

and seizure. *de la Fuente*, 548 F.2d at 533; *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984); *United States v. Tobin*, 923 F.2d 1506, 1521 & n.21 (11th Cir. 1991). A warrantless arrest is constitutionally valid only when there is probable cause to arrest. *See United States v. Watson*, 423 U.S. 411, 417 (1976); *United States v. Costa*, 691 F.2d 1358, 1361 (11th Cir. 1982).

Samuels does not challenge the legality of his traffic stop or his subsequent arrest in either his pre-hearing or post-hearing papers. [*See* ECF Nos. 32, 47, 50]. In fact, he concedes the stop and arrest were lawful. [*See* ECF No. 50 at 1]. Regardless, the Court concludes that the BSO was justified in stopping and arresting Samuels because there was probable cause to believe he was driving with a suspended license and committed the felony offense of stalking or harassment.

### C.      Inventory Search Doctrine

Now the Court addresses what's really in dispute and what the motion to suppress turns on: the inventory search exception to the warrant requirement. First, the law that governs.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. A search conducted without a warrant based upon probable cause is *per se* unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). An inventory search is one of these specific exceptions to the probable cause and warrant requirements of the Fourth Amendment. *See Colorado v. Bertine*, 479 U.S. 367, 371 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 370–71 (1976). An inventory search serves three main purposes: (1) "the protection of the owner's property while it remains in police custody"; (2) "the protection of the police against lost or stolen property"; and (3) "the protection of the police from potential danger." *Opperman*, 428 U.S. at 369 (internal citations omitted); *Bertine*, 479 U.S. at 372.

An inventory search of an impounded vehicle is lawful where law enforcement "(1) had the

authority to impound the car, and (2) followed department procedures governing inventory searches."

*United States v. Isaac*, 987 F.3d 980, 988 (11th Cir. 2021) (citing *United States v. Williams*, 936 F.2d 1243,

1248 (11th Cir. 1991)).  Here's the crucial language from *Issac* on the first part of that test:  Police have

the authority to impound a car if the decision to do so is "in good faith, based upon standard criteria,

*and not solely based upon suspicion of evidence of criminal activity.*"  *Id.* at 988–89 (emphasis added) (quoting

*Sammons v. Taylor*, 967 F.2d 1533, 1543 (11th Cir. 1992) (quotation marks omitted)); *accord United States*

*v. Johnson*, 777 F.3d 1270, 1277 (11th Cir. 2015), *overruled on other grounds, United States v. Watkins*, 10

F.4th 1179 (11th Cir. 2021).  "Though the search cannot be based on *only* the suspicion of finding

evidence, *an officer's expectation that evidence will turn up does not invalidate* an otherwise lawful inventory

search."  *Isaac*, 987 F.3d at 989 (emphasis added) (citing *United States v. Bosby*, 675 F.2d 1174, 1179

(11th Cir. 1982)).  "Once a car is lawfully impounded, officers may conduct a warrantless inventory

search of it if they continue to follow 'standardized criteria.'"  *Id.* (quoting *Sammons*, 967 F.2d at 1543).

"The government carries the burden to show that the requirements of this exception were met."

*United States v. Wilson*, 979 F.3d 889, 910 (11th Cir. 2020) (citing *Sammons*, 967 F.2d at 1543).

Now, how these principles apply to Defendant's case.

1.  The BSO Had Authority to Impound the Car.

First, the Court finds that the BSO's Policy Manual authorized the BSO deputies to impound

the black Nissan Versa that Samuels was driving on September 8, 2025.  Samuels claims that the BSO

lacked authority to impound car because the BSO did not ask or give the owner of the car (here, the

victim) an opportunity to "respond in a timely fashion" to move the car in accordance with the policy.

[*See* ECF No. 32 at 5; ECF No. 47 at 4 (citing BSO Policy Manual § 7.9.4.C.5, ECF No. 47-1 at 4)].

He says that the BSO made an end run around this policy in a deliberate and strategic way to obtain

evidence.  [ECF No. 32 at 5].  The Court is not persuaded by this argument.

The touchstone here is the heart of Fourth Amendment case law: reasonableness.  *See United*

8

*States v. Vladeff*, 630 F. App'x. 998, 1000 (11th Cir. 2015) ("The critical question is not whether the police needed to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitously, but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason." (cleaned up) (quoting *Sammons*, 967 F.2d at 1543)).  The simple question presented is whether the BSO's decision to impound the Nissan Versa was reasonable in view of all the circumstances.  This Court answers yes.

Samuels's argument cherry-picks the BSO Policy Manual and focuses on a single favorable provision.  In pertinent part, that provision states: "If the driver is not the owner and the owner does not respond in a timely fashion, the vehicle will be towed." [BSO Policy Manual § 7.9.4.C.5, ECF No. 47-1 at 4].  But Samuels overlooks that the impound policy gives BSO police officers the authority to impound cars in many different situations.  *Cf. Isaac*, 987 F.3d at 989.

For instance, the BSO Policy Manual specifies in another section that, "If the vehicle poses a traffic hazard it will be impounded and towed per policy."[6] [BSO Policy Manual § 7.9.10.D, ECF No.

---

[6]     The Court acknowledges that this portion of the impound policy, located under the section titled "Vehicle in Right of Way," arguably requires that the vehicle "meets the definition of abandoned property defined in the Florida Statutes or applicable municipal/county ordinances" prior to towing if the car poses a traffic hazard.  [BSO Policy Manual § 7.19.10.A, ECF No. 47-1 at 6].  The (unartfully drafted) BSO Policy Manual does not appear to clearly necessitate a finding of abandonment as a prerequisite before authorizing the impoundment of a car that poses a traffic violation.  Instead, it appears to provide certain illustrative scenarios, and the lack of a conjunctive "and" in the section of the Manual in which it is located, and the lack of semi-colons between the lettered subsections in the Policy Manual all support the view that abandonment is not a prerequisite.

Although the Nissan Versa likely does not fit the "abandoned property" definition under Florida law, Fla. Stat. § 705.101(1)("'Abandoned Property' means all tangible personal property that does not have an identifiable owner and that has been disposed on public property in a wrecked, inoperative, or partially dismantled condition or has no apparent intrinsic value to the rightful owner."), it conceivably does under applicable municipal or county ordinances (which may permissibly define the term under the BSO Policy Manual).  Under Chapter 39 of the Broward County Code of Ordinances, "abandoned property" is defined not just specific to the *owner* of the vehicle, but is also defined as property "that has been improperly disposed of on public or private property, without intent to reclaim . . . ."  BROWARD CNTY., FLA., PROPERTY MAINTENANCE CODE ch. 39, art. X, § 39.131 (2026).  The disjunctive "or" under this provision suggests that a non-owner may abandon

47-1 at 7]. At the hearing, Deputy Chauvin testified that Defendant parked the Nissan Versa just south of an intersection in the middle of the road, facing northbound. [Hr'g Tr., ECF No. 45 at 27:2–10; *see also* ECF No. 48 at 3]. In a colloquy with the prosecutor, Deputy Chauvin stated the following:

> Q. Now, at this point, you weren't going to allow -- have the vehicle remain at that location. It had to be moved?
> A. Yes.
> Q. Why?
> A. It would have created a traffic hazard if it was left abandoned in the roadway.

[Hr'g Tr., ECF No. 45 at 30:15–20]. The decision to tow the vehicle for this purpose was clearly authorized. [*See* ECF No. 35 at 5; ECF No. 48 at 4].

Additionally, the BSO Policy Manual—in a provision *just below* the one Defendant selectively relies on [ECF No. 47 at 4–5]—reads: "Deputies may remove or cause the removal of a vehicle from any street or parking lot, if the driver is arrested for an arrestable traffic infraction." [BSO Policy Manual § 7.9.4.D, ECF No. 47-1 at 4]. It is undisputed that Samuels was arrested for driving with a suspended license. [*See* Hr'g Tr., ECF No. 45 at 38:14–17 ("[Q:] So at that point, Mr. Samuels is under arrest for stalking; right? [A:] He's under arrest for driving while license suspended at that time.")]. Of course, driving with a suspended driver's license is an arrestable traffic infraction under Florida law. *See* Fla. Stat. § 322.34(8)(a); *State v. Jordan*, 590 So.2d 1118, 1118 (Fla. 4th DCA 1991) (per curiam) ("Driving without a valid operator's license is a violation of section 322.34, Florida Statutes (1989), and justifies an arrest."). And, of course, Samuels does not contest the legality of that arrest. [*See* ECF

---

personal property. The court takes judicial notice of the Ordinance. *See* Fed. R. Evid. 201(c)(1) (stating that a court "may take judicial notice on its own"); *Cash Inn of Dade, Inc. v. Metro. Dade Cnty.*, 938 F.2d 1239, 1242 (11th Cir. 1991).

Here, Samuels, the mere operator of the Nissan Versa, abandoned the car under this provision of the county ordinance because he parked it in the middle of the road and immediately locked it after exiting it and secreted the key in his anal cavity. [*See* Hr'g Tr., ECF No. 45 at 32:18–22, 53:10–12]. The Court certainly does not find that Samuels established any "intent to reclaim" the victim's vehicle on these facts.

No. 50 at 1].  Accordingly, "[s]ince the arrest of [Samuels] was lawful, the police ha[d] authority to impound his car." *United States v. Obasuyi*, No. 13-20777-CR, 2014 WL 495738, at *7 (S.D. Fla. Feb. 6, 2014) (Martinez, J.).

What's left of the first prong of a lawful inventory search is good faith.  Samuels heavily contests this question, arguing that the search was "a ruse for a general rummaging in order to discover incriminating evidence." [ECF No. 47 at 8 (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990))].  For this, Samuels argues that the following facts clearly show that the BSO acted in bad faith in conducting an inventory search:

- The deputies did not contact the owner of the vehicle to give her time to respond in a timely fashion;

- Deputy Chauvin immediately walked towards the black Nissan Versa after arresting Samuels to inspect its contents;

- Deputy Chauvin rummaged through Samuels's pockets after his arrest to find car keys, asking, "Where are the keys?";

- After searching through Samuels's pockets, Deputy Chauvin returned to the locked car and tried opening it;

- Deputy Barbato visited the victim's residence to see if she had a key to the car, rather than asking her to move it or to pick it up;

- Deputy Chauvin turned off his body camera as Deputy Barbato left the scene and reactivated it at around 10:43 a.m. when the tow truck driver was already present and opening the vehicle;

- As soon as the tow truck driver opened the car, the deputies searched the car and Deputy Chauvin exclaimed, "Jackpot, baby!" and "I f-ing knew it," as they discovered firearms in a backpack on a seat; and

- The deputies made statements before the vehicle was searched and towed that showed they were conflicted on the justification of the search; they are heard on body-worn camera footage discussing whether the search-incident-to-arrest exception applied.

[ECF No. 47 at 4–8].  Samuels heavily relies on, and attempts to analogize this case with, *United States*

*v. Rigby*, No. 24-20273-CR, 2024 WL 4792811 (S.D. Fla. Nov. 4, 2024) (Torres, M.J.), *report and recommendation adopted*, 2024 WL 4785450 (S.D. Fla. Nov. 14, 2024) (Middlebrooks, J.), where the Honorable Donald M. Middlebrooks suppressed evidence in a purportedly similar inventory search exception case.  [*See generally* ECF Nos. 47, 50].  *Rigby*, however, is readily distinguishable.

In *Rigby*, Miami police officers initiated a traffic stop upon seeing the defendant in the driver's seat of a U-Haul van not wearing a seatbelt.  2024 WL 4792811, at *1.  The defendant pulled into an apartment inlet—which abutted a public sidewalk and was marked with tow-away signage—housing a dumpster.  *Id.*  Upon stopping, the defendant immediately exited the van, closed the door behind him, and locked the vehicle.  *Id.*  After asking for identification, an officer conducted a records check of the defendant before exiting her police vehicle and attempting to open the van's locked driver's side door.  *Id.* at *2.  Officers then demanded a key to the van, warning, "I know you have it on you cause I saw you get out of the car"; the defendant then reached into his back pocket at which point the officer removed the key, opened the locked van, and began searching its interior.  *Id.*  Within five minutes of the stop, the officers confiscated a firearm, bag of marijuana, baggies of cocaine, and related drug paraphernalia from the van.  *Id.*  An officer celebrating the find exclaimed, "55–Convicto! I knew it, I knew it."

The officers then asked the defendant whether the renter of the U-Haul could bring the rental agreement to drive the van out of the apartment's dumpster bay.  *Id.*  During this time, an officer filled out a vehicle tow and storage receipt pursuant to Miami inventory search policy.  *Id.*  However, the officer left the section for listing vehicle contents blank, only filling a "property report" section that listed only the items utilized as evidence for criminal prosecution.  *Id.*  After he was indicted on possession of a firearm by a convicted felon and related drug charges, the defendant moved to suppress the evidence seized during his traffic stop.  *See id.* at *1–2.

United States Magistrate Judge Edwin G. Torres recommended granting Rigby's motion to

12

suppress because Miami policed conducted an unlawful inventory search of the U-Haul van. *See id.* at *8. Judge Torres addressed the first prong of the inventory search exception, underscored that Miami police lacked administrative authority to impound the van because the Miami Police Department vehicle impound policy explicitly required that officers "shall, prior to impounding a vehicle, afford the owner or the driver at his or her option, a reasonable opportunity in light of the circumstances in which to provide for the removal of the vehicle within a reasonable length of time." *Id.* at *4. The officer did not follow this standard criteria; instead, the officer *immediately*: (1) attempted to open the defendant's vehicle; (2) asked him for the van's keys; (3) placed him in handcuffs; and (4) searched the van—all without providing the defendant any opportunity to remove the vehicle by an authorized third party. *See id.* Crucially, Judge Torres explained that the search of the van was likely one based "*solely* on suspicion of finding evidence of criminal activity" because of the "sheer speed" at which the defendant's van was searched from the time of the stop, and the officer's subsequent exclamation, "55–Convicto! I knew it, I knew it," mere seconds after unlocking the van and discovering the firearm. *Id.* at *5 (emphasis in original).

For many reasons, our case is not *Rigby*. To start, the undersigned briefly notes the core distinction between the inventory search policy in that case and the one present here. The first clear difference is that the policy in *Rigby* was much more specific in requiring notice to the owner of the vehicle. The procedure in that case simply cannot be squared with the one here. *Compare Rigby*, 2024 WL 4792811, at *4 ("The officer *shall*, prior to impounding a vehicle, afford the owner or the driver at his or her option, a reasonable opportunity in light of the circumstances in which to provide for the removal of the vehicle within a reasonable length of time." (emphasis added)), *with* [BSO Policy Manual § 7.9.4.C.5, ECF No. 47-1 at 4 ("If the driver is not the owner and the owner does not respond in a timely fashion, the vehicle will be towed.")]. For purposes of the Fourth Amendment, "standard criteria governing decisions to impound vehicles need not be detailed criteria." *United States v. Moss*,

13

748 F. App'x 257, 260 (11th Cir. 2018) (alteration adopted) (internal quotation marks omitted) (quoting *Johnson*, 777 F.3d at 1277).

The next big difference is that *Rigby* did not address any other provision of the towing policy that could authorize the inventory search; in fact, the Government in that case did not argue road hazard as a justification to impound the U-Haul van at all. *Compare Rigby*, No. 24-20273-CR, Response in Opposition to Defendant's Motion to Suppress, ECF No. 23, *with* [ECF No. 48 at 4–5, 7]. Indeed, only the "Vehicle Owner or Driver Placed in Custody" provision of the Miami Police Department's impound policy was at issue. *Rigby*, 2024 WL 4792811, at *4. That policy also included a traffic hazard provision, and not as broad as those found in the BSO Policy Manual. *Compare Rigby*, No. 24-20273-CR, ECF No. 31-3 at 2, *with* [ECF No. 47-1 at 6–7]. But regardless of whether the Government pressed that provision in *Rigby*, there was no conceivable danger there; Rigby parked the U-Haul van in an apartment inlet and it only partially blocked a public sidewalk. Here, on the other hand, the Nissan Versa was positioned in the middle of a public road near an intersection, making it much more hazardous for other motorists on the street.

Moving to bad faith, we don't have the strong facts of "*only* suspicion of finding evidence of criminal activity" that Judge Torres had in *Rigby*. Key to his ultimate bad faith finding, His Honor made important credibility determinations regarding the officer who searched the defendant's van. He found the officer's testimony and version of events "quite tortured." *Rigby*, 2024 WL 4792811, at *7.[7] The undersigned evaluated both Deputy Chauvin and Deputy Barbato's testimony and demeanor during the evidentiary hearing in this case and does not make any adverse credibility finding. In fact, the facts of this case are largely undisputed; those officers no doubt were hoping to find evidence of

---

[7] It certainly did not help the officer's case that evidence was recovered within five minutes of stopping the U-Haul van. *See Rigby*, 2024 WL 4792811, at *2, 5. Here, however, the BSO deputies did not gain access into the Nissan Versa until approximately forty minutes after Deputy Chauvin initiated the traffic stop. [*See* Hr'g Tr., ECF No. 45 at 36:7–15, 42:7–9].

criminal activity in the vehicle.  But as recounted above in cases like *Isaac*, that does not convert an otherwise valid inventory search into an unlawful one.  The basic thrust of their testimony, consistent with the record, supports the deputies' view that Samuels was properly arrested and that the vehicle he operated presented a traffic hazard.

The inventory search of the Nissan Versa was not simply justified in "after-the-fact fashion," *id.*  While the tow truck was presumably called after Deputy Barbato returned from the victim's residence with no second key, this supports the Government's case and undermines Samuels's position.  When Deputy Barbato returned with no key, the BSO had no way of opening the vehicle parked in the middle of a public street in the middle of the day; it could not just be left there, it had to be towed.  *See Johnson*, 777 F.3d at 1277–78 (stating that the district court can use "common sense" and make "reasonable inferences" from the officer's testimony).  Unlike what Samuels suggests, it is not unreasonable or remarkable for the tow truck driver to then jimmy the door open for the BSO to access the car's interior.  After all, as Deputy Chauvin stated on cross-examination, "the purpose of the inventory search is to document the contents of the car *before* it's towed[.]"  [Hr'g Tr., ECF No. 45 at 44:14–16 (emphasis added)].  After the driver tows the car away, the BSO is "no longer in control of the vehicle" and thus "any items that are inside of that vehicle the tow truck driver may have access to."  [*Id.* at 31:13–32:2].  Obviously, this orderly procedure is one of the major reasons why this exception to the warrant requirement exists.  *See Opperman*, 428 U.S. at 369 (emphasizing that the inventory search exception stands for "the protection of the police against claims or disputes over lost or stolen property" among two other rationales).  As such, the Court does not agree that the facts concerning the access into the Nissan Versa infer bad faith.

To be sure, like with the officer's remarks in *Rigby*, Deputy Chauvin exclaimed words of excitement and vindication immediately upon finding the three firearms (here, that was "Jackpot, baby. I f-ing knew it").  [*See* Hr'g Tr., ECF No. 45 at 44:20–24].  As Samuels has it, this post-discovery

15

celebration combined with the pre-access discussion of the justification of a search of the vehicle (search-incident-to-arrest) and statements of belief that there is evidence of criminality in the vehicle purportedly suggests the entire inventory search was pretextual. [*See* ECF No. 47 at 6–7]. Not in this Court's view. Samuels ignores that "if an inventory search is otherwise reasonable, its validity is not vitiated by a police officer's suspicion that contraband or other evidence may be found." *United States v. Staller*, 616 F.2d 1284, 1290 (11th Cir. 1980) (quoting *United States v. Prescott*, 599 F.2d 103, 106 (5th Cir. 1979)). And as the Court thoroughly discussed, the search was otherwise reasonable. Deputy Chauvin's rapturous commentary, as well as the confusion regarding what Fourth Amendment exception applied, does not detract from the existence of at least two other objectively valid reasons to conduct the inventory search. The Court, therefore, cannot say that the search in this case was "*solely* based upon suspicion of evidence of criminal activity." *See Isaac*, 987 F.3d at 988–89 (emphasis added).

### 2. The BSO Followed Department Procedures.

The Court readily rejects Defendant's claim that the BSO deputies failed to follow their department's own procedure regarding inventory searches. This boils down to an alleged failure by the officers to (1) give the victim a reasonable opportunity to move her car, and (2) perform a complete inventory of the items found in the Nissan Versa. [*See* ECF No. 32 at 5; ECF No. 47 at 8–9]. The first contention is without merit, as explained above, because the BSO Policy Manual gave deputies the discretion to impound a vehicle in various instances. The second reason, too, fails to move the needle.

The BSO Policy Manual requires deputies to "perform a complete inventory on all property taken for evidence or safekeeping. All containers will be opened and their contents listed on an Incident Report and/or Property Receipt." [BSO Policy Manual § 10.16.7.A, ECF No. 47-2 at 3]. Here, BSO deputies filled out two forms: (1) an "Evidence Unit Property Sheet"; and (2) a "Towed

16

Vehicle & Inventory Receipt Form." [*See* ECF Nos. 47-3, 47-4]. The former listed the evidence seized (three firearms and ammunition) and miscellaneous items (e.g., a backpack and money). [ECF No. 47-4 at 1–6]. The latter listed "[s]hoes, bags and other miscellaneous personal items." [ECF No. 47-3 at 1]. These inventoried items, however, are not enough according to Samuels; he urges that suppression is mandated under the Fourth Amendment because the BSO omitted some items, such as a designer purse and tools. [*See* ECF No. 47 at 9]. That dog does not hunt.

Aside from the fact that "miscellaneous personal items" on the Towed Vehicle & Inventory Receipt Form seemingly captures these missing materials, such a minor (or really, *de minimis*) deviation does not mean the Government has failed to meet its burden. The question really becomes whether suppression is required when officers, who conduct an inventory search in good faith for valid reasons, clumsily miss a few items in their inventory documentation. Unsurprisingly, the Eleventh Circuit has routinely said no. *See, e.g.*, *United States v. Gordon*, No. 24-13035, 2025 WL 2112464, at *4 (11th Cir. July 29, 2025) ("And any purported *minor* deficiencies in the [property] receipt did not render the inventory search invalid because the officers otherwise complied with the relevant policies." (emphasis added) (citing *United States v. O'Bryant*, 775 F.2d 1528, 1534 (11th Cir. 1985))). Like with the policy in *Gordon*, the BSO inventory policy "states that officers must list the contents of the inventory, which they did, but does not require a certain level of specificity." *Id.*; [*see* BSO Policy Manual § 10.16.7, ECF No. 47-2 at 3]. The fact that the BSO "completed the inventory receipt in a perfunctory manner," *Gordon*, 2025 WL 2112464, at *4, does not convincingly sway this Court towards voiding an otherwise reasonable search under the Fourth Amendment.

## V.    CONCLUSION

Because the Court concludes that the BSO conducted a valid inventory search consistent with the Fourth Amendment, it need not consider the inevitable discovery or fruit-of-the-poisonous tree

doctrines.[8]  Accordingly, it is hereby **ORDERED AND ADJUDGED** that the Motion to Suppress

Evidence [**ECF No. 32**] is **DENIED**.

      **DONE AND ORDERED** in the Southern District of Florida on May 1, 2026.

 

 

                              _____

                              DAVID S. LEIBOWITZ

                              UNITED STATES DISTRICT JUDGE

cc:     counsel of record

---

[8]  Samuels also raised an argument only in passing regarding inculpatory statements made in violation of his Fifth Amendment Due Process rights.  [*See* ECF No. 32 at 8–9].  However, Samuels presented no evidence at the suppression hearing regarding the voluntariness of his *Miranda* waiver.  [*See generally* Hr'g Tr., ECF No. 45].  At the May 1, 2026, status conference, Samuels also declined to submit anything further on this argument.  As such, the Court rejects this conclusory contention and denies suppression on this ground as well.  *See Richardson*, 764 F.2d at 1527.